ORLESSES GATES, by SEALEM GATES, his guardian, *ad litem*,

*v.*

## J. A. THATCHER.

Under the 5th sec. of the act of Congress, app'd Feb. 24, 1864, the Secretary of War may prescribe any regulations necessary or reasonable to protect either the Government, the substitute or the principal.

If certain bounty money was deposited with the defendant, as a member of the board of enrollment, to be paid to the plaintiff upon his being mustered into the service of the U. S., as a substitute for a drafted man, in accordance with regulations emanating from the War Department, the plaintiff never having been so mustered in, and the defendant having paid over the money to a third party in obedience to orders from the Secretary of War, is not liable.

Upon the trial, the court admitted testimony as to the agreement between the plaintiff and one B. in the absence of the defendant, no notice of the agreement being brought to the defendant. *Held:* to be erroneous.

This action was brought in the District Court for Ramsey county. The allegations of the complaint are substantially, that on the 14th day of April, 1865, the defendant had and received of plaintiff (a minor) to his use the sum of $410, and executed to the plaintiff his receipt therefor in writing; that before the commencement of this action, plaintiff presented said receipt and demanded said money, which was refused.

The answer alleges, substantially, that the defendant at said time was Commissioner of Enrollment in the Board of Enrollment for the Second Congressional District of the State of Minnesota; that at that time the plaintiff was presented to the Board of Enrollment by Francis X. Brousseaux, a substitute broker, as a substitute in the army of the United States, for some principal who did not appear, and whose name was unknown to defendant; that said Brousseaux deposited with said Board $410, as bounty money for such proposed substitute, to be paid him when he should be accepted as such substitute and actually sworn and mustered into said army, at the first ensuing pay day, provided such substitute should remain in such army until pay day, and not otherwise, as by them agreed; that said Board, by said defendant, gave some official receipt for said money, as they were required to do by the rules and regulations of the War Department, as plaintiff well knew; that said plaintiff never was accepted as a substitute, or mustered in; that said money was paid over under an order of the War Department to said Brousseaux; that all the acts of said defendant, in relation thereto, were done pursuant to the orders, rules, and regulations of the War Department, and in the discharge of his official duties, as plaintiff well knew. Defendant denies receiving any money of plaintiff except as above admitted.

The reply admits that defendant was Commissioner, as alleged, but denies all the other allegations of the answer.

At the trial, the plaintiff testified substantially as follows: I saw Brousseaux pay defendant the money, $410. It was

paid me for enlisting as a substitute. I signed five or six papers after being accepted, was sworn in by Capt. Keith. After I was sworn in, defendant asked me if I wanted $50 or $100 before I went to the Fort, and said if I did I could have it. My father told him I did not. He then gave me the receipt. They then put U. S. clothing on me, took me to the quarters and gave me rations. I remained all night and one day, was then taken back to clothing room, and ordered to take off those clothes, which I did. I then demanded the money; defendant said the money was paid back to the principal. Capt. Keith told me the U. S. had no further claim on me. Plaintiff then testified (under objection by defendant, overruled by the court and exception taken,) in relation to the arrangement between himself and Brousseaux, made in the absence of defendant.

Upon cross-examination he said: I never had the money in my possession; did not know a part was to be paid next pay day. Defendant told me, in substance, that I could get my money after I went to the Fort. My father was with me.

Sealem Gates, a witness for plaintiff, testified substantially as follows: I am plaintiff's father, was present when receipt was given. Defendant signed it and delivered it to my son. I saw the money handed to defendant. He asked plaintiff if he wanted $50 or $100 to spend before he went to the Fort. I said he had money enough. My son was examined and accepted. Capt. Keith handed out to him five or six papers to sign, he signed them, the oath was administered; defendant told him when he reached the Fort to give this (the receipt) to Col. Morgan and get his money. Witness then testified (under objection, overruled and exception taken,) in relation to statements made by Brousseaux not in defendant's presence. Witness further testified on cross-examination: The reason why the money was not paid over was because some had slipped the guard and escaped. The understanding was that the boy should have his money when he handed the receipt to Col.

Morgan at the Fort. He never handed the receipt to Col. Morgan at the Fort. He never demanded the money of him. Defendant did not tell who the principal was, nor claim that the arrangement was not complete; did not decline to pay on any ground, except that he had paid it to principal. Plaintiff then read in evidence the receipt in words and figures following:

"Pro. Mar. Office, 2nd Dist. Minn.,
St. Paul, April 14, 1865.

"Received of Orlesses Gates four hundred and ten ($410) as bounty substitute one year.

"J. A. THATCHER,
"Com'r of Enrollment, 2nd Dist. Minn."

A letter from defendant to plaintiff's attorney was then read in evidence, containing in substance the following statement: Brousseaux came into the office, saying he had a man who desired to go as a substitute, and would secure a principal the next day. He said the boy was to go for $410. He was sworn in and signed the papers. The money was counted out to me, and a receipt given as ordered by the War Department; by the orders the Provost Marshal gave such receipts, and if the substitute was mustered, the money was sent to Col. Morgan. The day after this partial arrangement was made, the Government sent a special order to discharge all substitutes not mustered, which released the boy. In these enlistments of substitutes there are three parties; the principal, the Government, and the substitute. If the principal had been there, his name would have been inserted in the enlistment papers. The papers were not completed and signed by any officer until the principal did appear. Gates' papers never were signed by any officer. I acted in good faith, and only as an officer. Here the plaintiff rested.

Defendant testified in his own behalf substantially as follows: Col. John T. Averill was acting assistant Provost Mar-

shal General, down to Sept., 1865. Capt. Keith, Dr. Stewart and myself, composed the Board of Enrollment. Plaintiff came to Provost Marshal's office, 13th or 14th April, 1865, with Brousseaux and the boy's father to be examined. The boy was pronounced suitable and sworn in. Brousseaux gave me $410, to be given to the boy as bounty money, and said a principal would be produced the next morning. I notified the boy when I took the money, that he would receive it on presenting his receipt to Col. Morgan, at Fort Snelling. I told him he could have some of the money then, by direction of the Department, if he needed it. The facts were stated to all the substitutes when they came in. We told them the money was deposited with the board for the protection of the substitute, the principal, and the Government, and afterwards transferred to Col. Morgan at the Fort, to be paid over to the substitute at the next ensuing pay day. We did so that the substitute could see the money paid in, and he was assured it was safe after being mustered in. In two hours after he was sworn, we received orders from Government to take no more substitutes. I passed the money to Capt. Keith; it was deposited with other substitute money. Keith handed it back to me May 4th last, and I paid it to the order of Brousseaux. We generally told substitutes the whole story; I don't remember particularly about this case. The principal never appeared. The Government did not accept this substitute. I don't consider he ever became a soldier. The Board mustered in substitutes; this boy never was mustered in; had been sworn, but not to go for any particular man. This was done to benefit the substitute and accommodate the broker. For mustering in, a paper was made containing a description of the man; several copies of this were made; the parties then came in, were called up by Capt. Keith, answered to their names, and were then told they were mustered in; this was the last step, and never was done with the boy. If the principal had appeared, he would have signed the papers. Capt. Keith had

not and could not sign the oath until the principal was in; none of the papers could be executed till the principal came in; there was no principal in this case to my knowledge. I told the boy in general terms why he could not be received. I returned the money to Brousseaux because I was ordered to do so. Defendant then read in evidence four orders, the first three headed:

"Act. Ass't Pro. Mar. Gen's Office,
"St. Paul, Minn.,"

directed to

" *Capt. Geo. H. Keith, Pro. Mar. 2d Dist. Minn.*,"
and signed,

"John T. Averill,   *   *   *
"A. A. P. M. Gen. Minn."

The first of these three contained, among other things, the following: "In accordance with orders received from Washington, no more musters into the service of the United States, will be made of recruits, drafted men and substitutes.   *   * In the event of your having substitutes who have been examined and not mustered, all action up to this time will be cancelled.   *   *   *   " This was dated April 15, 1865. The second contained, among other things, the following: "In all cases where substitutes have been discharged by order of War Department of April 14, 1865, the money to be paid to such substitutes will be refunded to the principal.   *   *   * Be particular in every instance to give official notice to such principals that their substitutes are not received," &c. This was dated April 20, 1865. The third contained, among other things, the following: "You are hereby authorized and directed to receive the full amount of money from persons presenting and furnishing substitutes, which is due said substitute from the principal on account of his enlistment;   *   * this money should be forwarded to Col. G. N. Morgan, commanding draft rendezvous at Fort Snelling. A receipt should be given to the substitute, agreeing to transport this money

vol. xi.—14

\* \* \* to the officer above named, who will dispose of the same according to orders from the War Department on this subject." This was dated Feb. 7, 1865. The fourth order was in the words and figures following:

　　　　　"WAR DEP'T, PRO. MAR. GEN'S BUREAU,
　　　　　　　Washington, D. C., April 14, 1865.
"Lt. Col. JOHN T. AVERILL,
　　"A. A. Pro. Mar. Gen., St. Paul, Minn.,

"All men drafted under the call of December 19, eighteen hundred and sixty-four, (1864,) who have not been forwarded to general rendezvous, will be released. This order not to apply to substitutes already mustered in.
　　　　　　　"N. L. JEFFRIES,
　　　　　"Brevet Brig. Gen. and A. P. M. Gen.
"Official copy,
　　"N. L. JEFFRIES, Brevet Brig. Gen."

Witness further testified: I had notice of these orders before paying over the money. On cross examination, he said among other things: We got our orders from Col. Averill; we were obliged to do so by his orders; we could not go behind his orders; I was under oath to obey his orders. It was our duty to receive the money; we did it in all cases after we received the orders. I never saw any order to Col. Averill; it was not my business to look for such an order. It was the practice to clothe them before mustering in, and to give them rations also, as a matter of convenience.

The court charged the jury, among other things, as follows: "The rule undoubtedly is, that a person acting as a public agent, cannot be holden personally; but this defendant in receiving the money in question, was not acting as a public officer. It was no part of the duties of the board of enrollment to receive substitute bounties. The laws under which these boards were constituted provided for no such action on their part; although the Secretary of War, from very proper motives, had undertaken to regulate these matters, with a

view to the protection of the government and the substitute; that the orders of the Provost Marshal General in reference to these moneys were therefore extra-official, and the defendant in acting under them, was not acting as a public officer, but as an individual; that the orders did not protect the defendant, unless it was shown that the plaintiff contracted with knowledge of them." To which charge the defendant excepted.

The jury, after retiring to consider their verdict, returned into court and desired to know what the evidence was as to the agreement between the parties at the time the money was deposited with the defendant. The court repeated the testimony as to what occurred at the time the money was deposited. The court was then requested by plaintiff's counsel, to call the attention of the jury to the testimony as to what occurred between plaintiff and Brousseaux, before the deposit with defendant; whereupon the court referred to that testimony, and stated to the jury, "that what occurred then could not be considered as binding upon the defendant, unless the knowledge of it was brought home to him." The jury brought in a verdict for plaintiff; the defendant thereupon gave notice of a motion for a new trial upon the following grounds: 1st. Insufficiency of the evidence to justify the verdict, and that it is against law. 2d. Errors in law occurring at the trial, and duly excepted to by the party making the application. This motion coming on to be heard, was denied by the court, and the defendant appeals to this court.

MORRIS LAMPREY, for appellant.

I. The court erred in admitting parol evidence to show that the plaintiff was sworn, inasmuch as the record was the best evidence; and there is no evidence in the case to show what papers the plaintiff signed, or the nature thereof. The court also erred in receiving in evidence the statements of Brousseaux, made when the defendant was not present, to

bind him. 1 Green. Ev., Secs. 86, 87, 88, and cases cited; 2 Phil. Ev. Cow. & Hill's Notes, 4 Am. Ed., 510, and cases cited.

II. The plaintiff never become a "substitute." He never was "mustered in," or "enlisted." He never entered into any contract of enlistment; because, the principal, whom he wished to find, and with whom he proposed to make such contract, never was found or known. No enlistment papers could have been executed, because there was no principal whose name could be inserted in them; and to say that the plaintiff was sworn as a substitute for a particular principal when there was no principal, looks too much like swearing in blank, and is simply absurd. The proposed negotiations fell through, which is nothing unusual. The Government refused to accept, or muster in the plaintiff, as it had the undoubted right to do, and no man was ever exempted from service by reason of the plaintiff becoming his substitute. There cannot be an agent unless there is some principal. No person appeared for whom he could possibly be substituted, and no demand of the money was ever made of Col. Morgan. By consequence, the plaintiff never became in any way entitled to the bounty "substitute money," for one year, in the language of the receipt, since he never became a bounty substitute at all.

"Before militia are received in the service of the United States they shall be mustered by an Inspector-General, or some other officer of the regular army, specially designated to muster them." "And in case any individual shall be discharged within three months after entering the service, for a disability which existed at that time, he shall receive neither pay nor allowances, except subsistence and transportation to his home."

"No militia or volunteers shall be paid till regularly mustered into service, as provided in the General Regulations." General Regulations United States Army, Secs.

1665, 1666, 1834; 12 United States Statutes at Large, page 732, Secs. 4, 5, 6, 7, 8, 9, page 733; Sec. 13, page 734; Secs. 16, 17; Amendment of Act of Congress for calling out national forces, &c., of March 3d, 1863, approved Feb. 24th, 1864, Secs. 1, 5, 16; Acts of Congress, 1864, 1865, page 77, Secs. 14, 16, 23; Digest of Opinions of Judge-Advocate-General, page 83, Secs. 1, 2, 3, 4; 1 Green. Ev. Secs. 479, 480, 482, 483,484, 491, 492, 496.

III. The defendant was a public officer, sworn to obey the orders of his superiors, and was acting as a public agent in these premises, and is, therefore, not liable individually. The money never was received by the defendant; but it was received, receipted for, and held by the Board of Enrollment, under the regulations of the War Department, authorized by act of Congress.

"When public agents in good faith contract with parties having full knowledge of the extent of their authority, or who have equal means of knowledge with themselves, they do not become individually liable, unless the intent to incur a personal responsibility is clearly expressed, although it should be found that through ignorance of law they may have exceeded their authority."

"When an enlisted man arrives at a draft rendezvous, any money he may have with him, exceeding twenty dollars, will be taken and placed in the hands of the paymaster." A strict monthly account current of such money is required to be rendered to the Paymaster General; the money is deposited in a public depositary of the United States; and after arriving at his regiment, the soldier may claim payment of the amount of his deposit from the paymaster who pays his regiment on the first regular payment being made him, or on the next ensuing pay day after muster. At the less important rendesvous, an officer of intelligence and good character is appointed to receive the moneys, instead of a paymaster; and the custody and control of such moneys are fully regulated by the

government. This is required by the exigencies of the public service. Government can only act by its agents; and no prudent man would be an agent, if he were to be personally bound. The defendant received no benefit whatever from the money. He was placed under the control of the Provost Marshal General and his assistants, by acts of congress, as commissioner of the board of enrollment. *Sanborn v. Neal*, 4 Minn., 126; 3 Conn., 564⅝; 10 Conn., 339; 14 Conn., 248; 21 Conn., 627; 22 Conn., 379; 18 Johns., 124; 8 Cow. 191; 1 Mass., 208; Sto. Ag., Secs. 302, 303, 304, 305; Dunlap's Paley's Agency, page 376; 1 T. R., 180; 2 Kent, marg. pages 632, 633; 1 Curt., 423; 9 Mass., 490; Gen. Ord. W. Dept. No. 305, Dec. 27, 1864; Rev. Reg. of Bu. Pro. Mar. Gen., pages 1, 2, 4, 7, and Secs. 49, 52, 54, 75, 96, 97, 98, 99, 100, 102, 103, 104, 105; 9 Minn., 172; 1 T. R., 674; 3 Dall., 384; 1 Cranch, 345; 11 How., 362; 12 Wend., 179; 2 Taunt., 374; 12 Johns., 444; 15 Johns., 1.

IV. If it can be supposed that the plaintiff had any right of action at all, his remedy must be against Brousseaux alone.

V. The court erred in charging the jury that the defendant was not acting as a public officer, and that the orders under which he acted were no justification. And the court erred in his theory of the law of this case; and the order denying the motion for a new trial should be reversed.

W. H. GRANT, for respondent.

I. This is an action for money had and received, and can be maintained whenever it appears that the defendant has received or obtained possession of the money of the plaintiff, which in equity and good conscience he ought to pay over to him. 1 Greenl. Ev., Sec. 177; 1 Chitt. Pl., 351, and cases there cited.

II.   The only material question of fact before the jury was as to the ownership of this money, its receipt being admitted by the pleadings.

III.   The court committed no error in permitting the fact that the plaintiff was sworn to be shown by parol, as the case shows that there never was any record of the oath, and the respondent did not except to the ruling, and the fact was otherwise proved without objection.

The fact that the plaintiff became and was a substitute and a soldier, may be shown in many other ways than by producing the enlistment papers.

The court very properly admitted the statement of Brousseaux as to the money, as a part of the *res gestæ*, and as the appellant claims that this money was his money, and sought to discharge himself by paying this money back to him.

IV.   It was not necessary, to hold a party enlisting in the service, that he should be mustered.   The fact that there was no principal was not known to the plaintiff, and the arrangement to bring in a principal the next morning, was between Brousseaux and Thacher.   The agreement with Brousseaux was that the money was to be the plaintiff's as soon as he was sworn in.

The several acts of congress, and sections from the Army Regulations, and the opinions of the Judge Advocate General, and the revised regulations of the bureau of the Provost Marshal General, as well as General Order No. 305, have no application to this case.

V.   The only remaining question to be disposed of is, as to whether the appellant was so acting as a public officer that he can be permitted to appropriate $410 of the plaintiff's money to *private use*, without compensation.   We submit he cannot.   Story's Agency, Secs. 302, 306, 307 ; 7 Johns., 179 ; 10 Pet., 80 ; 10 Pet., 137 ; 9 Mass., 272 ; 12 Johns., 385 ; 13 Johns., 313.

*By the Court*—McMILLAN, J.—There is no doubt, from the evidence in this case, that the defendant supposed he was acting officially in the transaction upon which this action is based, and intended to act in his official character as a member of the board of enrollment; and he here relies upon his official character in the transaction as a defense to the action. But the court below did not sustain this defense. Upon this point the court charged the jury as follows: "The rule undoubtedly is, that a person acting as a public agent cannot be holden personally; but the defendant, in receiving the money in question, was not acting as a public officer. It was no part of the duties of the board of enrollment to receive substitute bounties; the laws under which these boards were constituted provided for no such action on their part, although the Secretary of War, from very proper motives, had undertaken to regulate these matters, with a view to the protection of the government and the substitute; that the orders of the Provost Marshal in reference to these moneys were therefore extra-official; and the defendant, in acting under them, was not acting as a public officer, but as an individual; that the orders did not protect the defendant, unless it was shown that the plaintiff contracted with knowledge of them." It would seem to be conceded that the ground upon which the defense set up is rejected, is the want of authority in the Secretary of War to authorize, through his subordinates, or establish these regulations, as to substitute bounties. The existence in fact of orders in terms covering the action of the defendant as a member of the board of enrollment, is admitted, but the legal validity of these orders is denied. We shall therefore consider the matter in this light.

By the eighth section of the act of congress, approved March 3, 1863, (Stat. at Large 1862–3, page 732,) a board of enrollment is created for each enrollment district, composed of the Provost Marshal, as president, and two other persons, to be appointed by the President of the United States, one of

whom shall be a licensed and practicing physician and surgeon. The duties of the board are defined in various sections of this act, and an amendatory act, approved February 24, 1864. The fifth section of the act of congress approved February 24, 1864, (Stat. at Large 1863–4, page 6,) provides, *inter alia*, that any person drafted into the military service of the United States may, before the time fixed for his appearance for duty at the draft rendezvous, furnish an acceptable substitute, *subject to such rules and regulations as may be prescribed by the Secretary of War*. Clearly, we think, by this provision, the Secretary of War may prescribe any regulations necessary or reasonable to protect either the government, the substitute, or the principal. The regulation in this instance accomplishes all these objects; it secures a willing recruit, and protects the principal and substitute from any opportunity of defrauding or deceiving each other, and as the board of enrollment are to perform the duties attending the reception of the substitute into, and the discharge of the principal from the service of the United States, the regulations of the Secretary of War, conveyed to them by orders, are obligatory upon them. If, therefore, this money was deposited with the defendant as a member of the board of enrollment, to be paid to the minor plaintiff upon his being mustered into the service of the United States as a substitute for a drafted man, the board being authorized by the War Department so to receive it, the plaintiff never having been so mustered in, and the defendant having paid over the money to Brousseaux, in obedience to orders emanating from the Secretary of War, the defendant is not liable. But it is contended by the plaintiff that the agreement between him and Brousseaux was, that he should have the money upon being sworn in. If this was the agreement, the defendant would not be protected by the order. Upon the trial, the court admitted testimony as to the agreement between the plaintiff and Brousseaux, made in the absence of the defendant, to which the defendant objected and excepted. We think

this objection is well taken, and the exception must be sustained. The jury, after being out some time, having retired to consider of their verdict, returned into court and desired to know what was the evidence as to the agreement between the parties at the time the money was deposited with defendant. The court thereupon repeated the testimony as to what occurred at the time the money was deposited; the court was then requested by plaintiff's counsel to call the attention of the jury to the testimony as to what occurred between plaintiff and Brousseaux before the deposit with defendant; whereupon, the court referred to that testimony, and stated to the jury that what occurred then could not be considered as binding upon the defendant, unless the knowledge of it was brought home to him. This was doubtless correct; but the testimony had already gone to the jury under the defendant's exception, and we are unable to discern anything bringing the agreement between the plaintiff and Brousseaux to defendant's notice, nor is it urged by the plaintiff's counsel on that ground. It is evident from the inquiry of the jury upon their return into court, that they hesitated upon that part of the agreement, and we feel strongly inclined to think that the defendant was seriously injured by the admission of the testimony objected to.

Order denying a new trial reversed, and new trial granted.

WILSON, CH. J.—I concur in the view that the order in this case denying the motion for a new trial should be reversed.

It is not necessary to determine, whether the ruling of the court below receiving parol evidence to show that the plaintiff was sworn into the service was erroneous, as such ruling was not excepted to.

The principal question to be decided is, what was the contract between the plaintiff and defendant? If the money was delivered to the defendant, to be held absolutely and unconditionally for the plaintiff, then the defense set up is insufficient.

But if the contract was that the money should be held by defendant, to be paid when the plaintiff was mustered into the service as a substitute for some principal, or on any other conditions, then it is incumbent on the plaintiff as a condition precedent to his right of recovery, to show that the contract has been performed, and the conditions complied with on his part.

The evidence offered, both on part of plaintiff and defendant, conclusively shows that the money was not taken by the defendant to be held absolutely and unconditionally, subject to the plaintiff's order.

The remark made by defendant to the plaintiff on receipt of said money, that the plaintiff could, if he needed it, have $50 or $100, shows that it was well understood that defendant had a right to hold the whole, or at least a part of said money, as against the plaintiff.

The plaintiff's father, who seems to have acted for him in the whole transaction, testifies : " The reason why the money was not paid over was, because some had slipped the guard and escaped. The understanding was, that the boy should receive the money when he handed the receipt to Col. Morgan, at the Fort."

The evidence in the case, we think, conclusively shows that the plaintiff well knew that this money was received by the defendant in accordance with the rules of the office, and that it should be paid over in accordance with said rules.

In accordance with the rules of the office, no money was to be paid to substitutes until they were mustered into the service ; and the plaintiff in this case never having been mustered, did not become entitled to said money. The evidence, therefore, did not justify the verdict, and a new trial should be granted.

The court below received evidence showing the statements of Brousseaux (substitute broker) to plaintiff, not made in defendant's presence. These statements, we think, were cal-

culated to, and we have no doubt did, affect the mind of the jury in deliberating on their verdict in this case.    This evidence was not competent.    In no view whatever could that evidence serve to enlighten the jury as to the contract between the plaintiff and defendant.

The order appealed from, I think, therefore, should be reversed.

BERRY, J.—I concur in each of the opinions filed in this case.